# United States Court of Appeals

## For the First Circuit

No. 09-1659

PAULA O'DONNELL,

Plaintiff, Appellant,

v.

DONNA BOGGS, THE BOSTON GLOBE EMPLOYEES CREDIT UNION,
BRENDAN HALL, WILLIAM FRANCIS, MARY LOU MEIGHAN, MARION DOUCETTE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before
Boudin, Circuit Judge,
Souter,[*] Associate Justice,
and Howard, Circuit Judge.

Scott E. Adams for appellant.
Elizabeth A. Houlding with whom Harvey Weiner and Peabody &
Arnold LLP were on brief for appellees.

July 8, 2010

---

[*]The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**BOUDIN**, <u>**Circuit Judge**</u>.  Paula O'Donnell, a former employee of the Boston Globe Employees Credit Union ("the Credit Union"), appeals from the dismissal on summary judgment of her Massachusetts state law claims alleging tortious interference with contractual relations by her supervisor and others.  On this appeal, the central issue concerns preemption of state law claims under Supreme Court precedent designed to protect the collective bargaining process governed by federal labor law.

O'Donnell began working at the Credit Union as a teller in 1974.  Her employment was governed by a collective bargaining agreement ("CBA") between the Credit Union and the Office and Professional Employees International Union, Local 6, AFL-CIO ("Local 6"), of which she was a member.  During the relevant period, defendant Marion Doucette was Manager/CEO of the Credit Union and was also a member of its board of directors ("the Board") along with Donna Boggs, Brendan Hall, William Francis, and Mary Lou Meighan.

According to O'Donnell, in 1998 as head teller she reported fraud and embezzlement by Gene Farrell, then Manager/CEO of the Credit Union, which "engendered hostility and antagonism from certain Board members."  Farrell was replaced later that year by Doucette.  Within the next year or so, O'Donnell was promoted to bookkeeper and then systems manager, positions in which she had some auditing and oversight functions.

In November 2000, Doucette hired her daughter Linda as bookkeeper. O'Donnell complained to Doucette and the Board that Linda was not qualified and was being paid more than the CBA schedule provided. O'Donnell says that then Doucette

> began a course of retaliation, intimidation and interference directed at Mrs. O'Donnell. . . . [including] verbally harass[ing] and intimidat[ing] Mrs. O'Donnell, obstruct[ing] performance of her duties, and prevent[ing] her from fully participating in managerial tasks that would allow her to maintain or advance her position in the Credit Union.

On O'Donnell's account, Doucette's behavior toward O'Donnell worsened when O'Donnell reported serious misconduct by Linda,[1] who was finally terminated in February 2003.

When the most serious charges of wrongdoing by Linda were reported to the state banking commission, O'Donnell claims Credit Union Board members Francis and Boggs blamed her and "hostile[ly] and antagonistic[ally] . . . retaliated by obstructing the performance of her duties." O'Donnell discovered that she had been locked out of a computer system and could no longer monitor Linda's still-active Credit Union account; when she told the Board, Boggs simply ordered her to clear certain checks submitted by Linda. By August 2003, O'Donnell says Doucette had expanded her retaliatory

---

[1] O'Donnell reported successively that Linda had bounced over a hundred checks on her personal Credit Union account (which were processed at Doucette's direction despite insufficient funds and against Credit Union policy), deliberately overridden security procedures on the accounting system to clear a personal check despite insufficient funds, and manipulated the clearing account and falsified financial records to fraudulently obtain funds.

and intimidating conduct, including "daily verbal abuse, almost weekly acts of physical violence . . . and weekly interference with the performance of Mrs. O'Donnell's duties," which "resulted in both actual physical, emotional and professional injury" to O'Donnell.

As a result, O'Donnell says that upon prudent medical advice, she stopped working on August 15, 2003, citing stress-related reasons. In late November 2003, the Credit Union requested that she provide a doctor's report, but she did not do so. She exhausted her sick leave and vacation time by December 2003, asked for further leave, and was refused because the Board concluded that Doucette had not committed any wrongful conduct that would warrant O'Donnell's leave of absence and, additionally, because O'Donnell had provided no medical evidence to show her need for the leave.

After a further warning that O'Donnell must return to work or face termination, O'Donnell was terminated. Local 6 filed a grievance on her behalf, claiming unjust termination in violation of the CBA; but it eventually withdrew the grievance, stating that the case lacked merit and that the Credit Union had not violated the CBA. O'Donnell then charged Local 6 with inadequate representation, but a regional director of the National Labor Relations Board dismissed the charge and O'Donnell's internal administrative appeal failed.

In the meantime, in April 2005, O'Donnell filed a lawsuit in Massachusetts Superior Court, alleging two counts of tortious

interference of contractual relations--one against her supervisor Doucette, and one against Board members Boggs, Hall, Francis, and Meighan. The defendants removed the case to federal district court, arguing that section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) (2006), preempted O'Donnell's state law tort claims; and they thereafter moved for summary judgment on the same ground.

There followed a second complaint by O'Donnell in federal court, which added another claim and was consolidated with the first; the district court permitted O'Donnell to file an amended complaint in the consolidated case that added yet another claim; and magistrate judge recommendations were issued on the first complaint and the amended one.

In the end the district court agreed that the tortious interference claims were preempted and their dismissal alone is challenged by O'Donnell on this appeal. Several other claims made by O'Donnell were dismissed on other grounds but O'Donnell has not challenged those dispositions. The district court's preemption ruling is primarily a legal issue subject to de novo review. Southex Exhibitions, Inc. v. R.I. Builders Ass'n, 279 F.3d 94, 98 (1st Cir. 2002).

On its face, section 301 merely confers federal court jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce," 29 U.S.C. § 185(a), but the Supreme

-5-

Court has deemed such contracts creatures of federal law, whatever the intent of the parties, <u>Textile Workers</u> v. <u>Lincoln Mills</u>, 353 U.S. 448, 451 (1957); and the Court treats section 301 as a warrant both for removing to federal court state law claims preempted by section 301 and then dismissing them. <u>Allis-Chalmers Corp.</u> v. <u>Lueck</u>, 471 U.S. 202, 220-21 (1985); <u>Avco Corp.</u> v. <u>Aero Lodge No. 735, Int'l Ass'n of Machinists</u>, 390 U.S. 557, 559-60 (1968).

The phrase "complete preemption" is often used in describing this state of affairs, <u>Beneficial Nat'l Bank</u> v. <u>Anderson</u>, 539 U.S. 1, 8 (2003), and it applies most readily to state-law contract claims purporting to enforce CBAs covered by section 301, <u>Local 174, Teamsters</u> v. <u>Lucas Flour Co.</u>, 369 U.S. 95, 101-03 & n.9 (1962). But the doctrine extends beyond this point to other claims, including purported state law tort claims, whose enforcement interferes with federal labor law and policy. <u>Allis-Chalmers</u>, 471 U.S. at 210-13. 220. "Just how far beyond has never been precisely settled." <u>Martin</u> v. <u>Shaw's Supermarkets, Inc.</u>, 105 F.3d 40, 42 (1st Cir. 1997).

Pertinent to the present appeal, the Supreme Court has declared that state law claims are preempted under section 301 if they "require construing the collective-bargaining agreement" because of the congressional interest in uniform interpretation of collective bargaining agreements. <u>Lingle</u> v. <u>Norge Div. of Magic Chef, Inc.</u>, 486 U.S. 399, 407 (1988). No Supreme Court decision has addressed directly preemption of tortious interference claims

under section 301, but many federal courts of appeals have done so, and a number including our own have found certain such claims preempted under section 301 where deciding them would require the court to interpret a CBA.[2]

Whether a given claim is completely preempted depends importantly on the elements of that claim under state law and the content of the applicable CBA. DeCoe v. Gen. Motors Corp., 32 F.3d 212, 216-18 (6th Cir. 1994); Covenant Coal, 977 F.2d at 899. Massachusetts imposes liability for intentional interference with contractual relations on two different bases: interference by the defendant with a third party's performance of its contract with the plaintiff, and interference by the defendant with the plaintiff's performance of its contractual obligations with the third party. Shafir v. Steele, 727 N.E.2d 1140, 1143-44 (Mass. 2000). See generally Restatement (Second) of Torts §§ 766, 766A (1979).

The elements of tortious interference with contractual relations, common to both theories of the tort under Massachusetts law, are as follows:

> [T]he plaintiff must prove that (1) he had a
> contract with a third party; (2) the defendant

---

[2]E.g., Magerer v. John Sexton & Co., 912 F.2d 525, 530-31 (1st Cir. 1990); Steinbach v. Dillon Cos., 253 F.3d 538, 540-41 (10th Cir. 2001); Oberkramer v. IBEW-NECA Serv. Ctr., Inc., 151 F.3d 752, 756 (8th Cir. 1998); Int'l Union, United Mine Workers v. Covenant Coal Corp., 977 F.2d 895, 899 (4th Cir. 1992); see also Kimbro v. Pepsico, Inc., 215 F.3d 723, 727 (7th Cir. 2000). Cf. Local 926, Int'l Union of Operating Eng'rs v. Jones, 460 U.S. 669 (1983) (considering preemption of such a claim under the National Labor Relations Act, 29 U.S.C. § 151 et seq.).

> knowingly interfered with that contract [by inhibiting the third party's or the plaintiff's performance thereof, depending on the theory]; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.

Harrison v. NetCentric Corp., 744 N.E.2d 622, 632 (Mass. 2001).

What is special about O'Donnell's claim in this case is that the defendants accused of interfering with O'Donnell's contractual rights with her employer--her supervisor Doucette and several members of the Board--are agents of the employer itself. The problems of separating unlawful interference from management's lawful control of its employees are obvious and Massachusetts law imposes special restrictions on tortious interference claims by employees against agents of the employer.[3]

Invoking both theories available under Massachusetts law, O'Donnell alleged in her complaint as amended that Doucette and the Board members knowingly acted in such a manner as "to induce the Credit Union to terminate [O'Donnell's] employment relationship" and "to cause O'Donnell injury and prevent her from fully performing her required duties for the Credit Union." She referred

---

[3]If the contract is for employment and the defendant is the plaintiff's supervisor or a corporate official of her employer acting within the scope of his or her employment or corporate responsibilities, the plaintiff must show "actual malice," Blackstone v. Cashman, 860 N.E.2d 7, 13-14 (Mass. 2007), but gradations of motive under state law do not control the preemption issue in this case which involves the relationship of the claim to the CBA.

to both theories in her opposition to the defendant's final motion for summary judgment.

O'Donnell's claim based on what she calls the "second distinct period of tortious interference"--the Board's decision to terminate her employment--is clearly preempted. No court or jury could decide whether the Board's termination of O'Donnell was improper without interpreting the CBA's terms, including articles XV and XX concerning leaves of absence and permissible discharges.[4] As the Eighth Circuit explained in Holschen, 2010 WL 842089, at *4, any expectancy of employment interfered with "cannot be contrary to the terms of the contract on which the expectancy depends."

On appeal, O'Donnell claims the district court did not adequately separate out and examine the "first discrete period" of alleged tortious interference--namely, the claimed harassment and retaliation by Doucette (and perhaps on one or more occasions by individual Board members) that led up to O'Donnell's August 15, 2003, abandonment of work. The parties dispute whether O'Donnell preserved this line of argument in the district court, but O'Donnell did invoke such conduct as interference. Anyway, claims based on that first period are also preempted even if examined independently.

---

[4]See Magerer, 912 F.2d at 530-31; Oberkramer, 151 F.3d at 756; Covenant Coal, 977 F.2d at 899; see also Holschen v. Int'l Union of Painters, No. 09-1122, 2010 WL 842089, at *4 (8th Cir. 2010).

-9-

O'Donnell's argument is that the actions of Doucette (and perhaps other Board members) were sufficiently hostile and disruptive that they made her unable to carry out her own duties, caused her need for medical leave, and made it impossible for her to return to work in accordance with her contractual obligations after her leave was exhausted. This claim might fit the latter of the two theories of tortious interference under Massachusetts law set forth above, subject to the further requirement under state law to show malice. See note 3, above.

The question remains whether such a claim would require interpreting the CBA, and the answer is not straightforward. On the one hand, O'Donnell has alleged as facts classic abusive treatment by Doucette motivated purely by personal resentment for the unmasking of misconduct by Doucette's daughter. Hawaiian Airlines v. Norris, 512 U.S. 246, 261 (1994) (preemption not triggered by "purely factual questions . . . [that] do not require a court to interpret any term of a collective bargaining agreement" (internal quotation marks omitted)). On the other hand, the claim asserted is that the conduct involved improper interference by a supervisor and Board members with an employee's performance of her duties. It is not easy to see how one could avoid considering the collective bargaining agreement.

Specifically, recognizing that the gravamen of the claim is "interference" with the contract, Doucette and any Board member

-10-

might be expected to defend various of the acts charged, to the extent their commission is admitted, as justified by supervisory and Board responsibilities authorized by the contract. Reproofs that O'Donnell regards as harassment would, from Doucette's point of view, be the censuring of an overzealous employee, and relevantly limiting O'Donnell's computer access might be defended as a proper response to O'Donnell's own prior behavior.

The CBA has a standard, broad management rights clause which reserves for the Credit Union "all management rights, powers, authority and functions" and "the sole and exclusive right to manage its business in every respect and to take any other action which the Credit Union deems desirable to the conduct of its business." This clause seemingly bears on Doucette's authority and that of any Board member acting individually, and a number of cases, including one of our own, rely on such clauses as the basis for complete preemption of employee claims of interference with contractual relations.[5]

O'Donnell's claim cannot be resolved without deciding, at a minimum, whether Doucette's and the Board members' conduct constituted--in the language of the management rights clause-- "action which the Credit Union deems desirable to the conduct of

---

[5]Steinbach, 253 F.3d at 540-42 (finding a plaintiff's claim that her supervisor's harassment interfered with her performance of her employment duties preempted because it required interpretation of a CBA's management rights clause); Magerer, 912 F.2d at 530-31; cf. Bartholomew v. AGL Res., Inc., 361 F.3d 1333, 1340 (11th Cir. 2004).

-11-

its business." This is so even if Doucette (or, less plausibly, the other defendants) had personal motives. O'Donnell and the defendants disagree about whether the clause encompasses that conduct; thus there is a "real interpretive dispute" implicating the CBA. Martin, 105 F.3d at 42.

The Supreme Court has carved out and protected from complete preemption certain types of claims which it has variously characterized; but the common denominator is that they depend on an obligation, usually rooted in public policy, that goes beyond the interests of the individual claimant.[6] So far as they concern interference with contractual obligations, the tort claims in this case are not of that character. O'Donnell did make a different claim based on a whistleblower statute, but it was dismissed on other grounds and that dismissal has not been appealed.

Finally, although not part of our analysis, we note that O'Donnell's wrongful discharge claim was the subject of a grievance by the union, which included its assertion that "one of the root causes for Paula's absences was on the job stress from a relationship between Paula and Marion Doucette." The union ultimately decided the grievance lacked merit, but at least this is

_____

[6]Hawaiian Airlines, 512 U.S. at 260-63 (whistleblower protection claims under federal and state law for reporting aviation safety issues); Livadas v. Bradshaw, 512 U.S. 107, 121-25, 135 (1994)(state law requiring prompt payment of wages); Lingle, 486 U.S. at 407-13 (claim under state law barring retaliation for filing worker's compensation claim).

-12-

not the more troubling case in which there is a preempted claim without the availability of a remedy under the CBA.

Affirmed.