**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

Nos. 22-1334, 22-1335

ROBERT M. EATON,

Plaintiff, Appellant,

v.

TOWN OF TOWNSEND; JAMES M. KREIDLER; GORDAN CLARK; CINDY KING;
CAROLYN SMART,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Gelpí, Lynch, and Thompson,
Circuit Judges.

    Leon Richard LeClair, III, with whom LeClair & LeClair, P.C.
was on brief, for appellant.
    Gareth W. Notis, with whom Francesca L. Cone and Morrison
Mahoney LLP were on brief, for appellees Town of Townsend, James
M. Kreidler, Cindy King, and Carolyn Smart.
    Christine Ann Maglione, with whom Harrington Rice & Maglione,
LLC was on brief, for appellee Gordan Clark.

May 9, 2023

**GELPÍ, Circuit Judge.** This case stems from Plaintiff-Appellant Robert Eaton's ("Eaton") termination from his position as chief of police of the Townsend Police Department ("TPD"). Eaton sued his former employer, the Town of Townsend, Massachusetts ("Town" or "Townsend"); Townsend's Town Administrator ("TA"), James Kreidler ("Kreidler"); and all three then-members of Townsend's Board of Selectmen ("BOS"): Gordan Clark ("Clark"), Carolyn Smart ("Smart"), and Cindy King ("King") -- collectively, they are the Defendants-Appellees ("Defendants"). On appeal, Eaton contends that genuine disputes of material fact exist as to his contract, due process, disability discrimination, and tort claims, and thus the district court erred in granting summary judgment in favor of Defendants. Our close review of the substantial record in this matter reveals that entry of summary judgment on each claim was proper and, accordingly, we affirm.

## I. Background

### A. Facts

When reviewing a summary judgment decision, we recite the facts in the light most favorable to the nonmovant -- here, Eaton. See Thompson v. Gold Medal Bakery, Inc., 989 F.3d 135, 138 (1st Cir. 2021). We first outline Townsend's basic government structure, then recount the salient details of Eaton's employment with the Town and his eventual termination, and finally, describe the case's procedural history before it arrived to us on appeal.

- 3 -

## 1. Townsend's Government Structure

In Townsend, the BOS is the Town's chief executive office and has the authority to establish policies for all other town agencies. At all times relevant to this case, the members of the BOS were Clark, Smart, and King. Townsend's Charter directs the BOS to act "through the adoption of broad policy guidelines that are to be implemented by officers and employees serving under it" and prohibits the BOS from "becom[ing] involved in the day-to-day administration of any town agency." However, the BOS is empowered to "make investigations and may authorize the Town Administrator to investigate the affairs of the Town and the conduct of any Town Agency." Per the Charter, the TA -- who during the entirety of Eaton's tenure was Kreidler -- is, among other duties, "responsible to the Board of Selectmen for the administration of all Town affairs" authorized by or under the Charter.

The BOS, excluding Clark, interviewed Eaton for the chief of police position during a public meeting on February 9, 2016. Clark recused himself from the hiring process because his wife, a former TPD employee, had a then-pending employment discrimination claim against the Town. On March 24, 2016, Eaton signed a contract with Townsend to serve as the chief of police for a three-year term beginning on May 1, 2016.

## 2. Eaton's Employment Contract

Per the terms of his contract, Eaton was the "commanding officer of all police and communications personnel," was in "direct charge of all law enforcement and communications activities of the Town," and was to "administer the Police and Communications Departments under the direction of the [BOS] in accordance with M.G.L. c. 41, Section 97A." Chapter 41 of the Massachusetts General Laws governs officers and employees of cities, towns, and districts, while section 97A -- referred to by the parties as the "strong chief" statute -- specifically provides that the chief of police (in a town, like Townsend, that has adopted the statute) shall be appointed by the town's BOS for a term of up to three years and may be removed for cause after a hearing. Mass. Gen. Laws ch. 41, § 97A. The statute also authorizes the chief to create police department regulations, subject to approval by the BOS, and establishes that the chief is in "immediate control of all town property used by the department, and of the police officers, whom he shall assign to their respective duties and who shall obey his orders." Id. In addition to these statutory

mandates, Eaton's contract obligated him to perform his duties in accordance with a job description provided by the Town.[1]

In addition to detailing Eaton's duties, his contract described his rights related to discipline, removal, and termination. Specifically, Townsend needed just cause to discipline, suspend, or remove Eaton, and removal required a majority vote by the BOS after a hearing. Eaton was entitled to be represented by counsel at his own expense during any disciplinary proceeding and to at least ten business days' written notice explaining the action being taken, the cause of said action, the dates and times of all alleged offenses, and the date and time of the hearing. The contract defines "just cause" as:

> i) Conviction of the Chief of any crime (whether a felony or a misdemeanor) involving moral turpitude, malfeasance, misfeasance or misprision in office;
>
> ii) [f]ailure to administer and manage the Police Department in an efficient, responsible manner;
>
> iii) [f]ailure after written warning to carry out the duties and responsibilities of Chief;
>
> iv) [a]ny other just cause.

---

[1] Eaton's contract referenced a job description dated September 4, 2001, however, the job description Eaton acknowledged receiving when he began his employment was dated March 25, 2012. Because our conclusions do not turn on which job description controlled, we need not go further.

### 3. Eaton's Employment

On May 1, 2016, Eaton's term as chief of police began. Throughout his employment, he routinely met with TA Kreidler, who informed Eaton that all Town department heads report to him and that he "act[s] like a filter to the BOS." During these meetings, Kreidler would relay concerns raised by Smart and Clark about the TPD, make "scandalous accusations" against former chiefs, and complain about certain TPD employees. Kreidler would also insinuate to Eaton that the BOS was not happy with his performance -- specifically, Clark, because Eaton had not demoted Lieutenant Giancotti (who was involved in Clark's wife's case) -- and that he may not make it through his six-month probationary period.

Prior to his start date, Clark had met with Eaton and requested certain personnel changes within the TPD. Eaton believed that Clark's complaints and requests were motivated by a desire to retaliate against members of the TPD who were involved in Clark's wife's employment issues. On separate occasions, Eaton informed both Clark and Kreidler that the requests were inappropriate and told Clark that his involvement in TPD matters created a conflict of interest. Eaton later shared his concerns about Clark and Kreidler's "continuous interference [into] the daily operations of the TPD" with Smart and King. During roughly this same period of time, Eaton received a text message and an email from Smart

expressing frustration over social media posts related to a movement to recall Smart and Clark.

## 4. CORI Investigation

In October 2016, during a meeting with Smart, Eaton revealed that he had received a package of information concerning Kelly Merrill ("Merrill") -- Kreidler's new administrative assistant -- and Merrill's boyfriend, Adam Cotty ("Cotty"), who had recently been released from jail and was on parole. Sergeant Girard provided the documents to Eaton, which consisted of an internal TPD database report on Merrill and a Criminal Offender Record Information ("CORI") report on Cotty. Eaton contends that he never showed or gave Smart the documents, however, he admits to telling her that the TPD had had numerous interactions with Merrill, including a well-being check related to her drug use, and that Cotty had numerous convictions and was on parole. After the meeting with Eaton, Smart reached out to Attorney David Jenkins ("Jenkins"), Town Counsel for Townsend, to inquire whether the TPD should be running CORI checks on Town employees.

After speaking with Smart, Jenkins informed Eaton that he believed that the CORI check had not been run for a law enforcement purpose and thus was illegal. Eaton disagreed and told Jenkins that "[t]he information that [he] provided to Smart was in the best interest of the community, that public employees have to be held to a higher standard and they must be properly

- 8 -

vetted to be trusted." Jenkins requested that Eaton perform a Criminal Justice Information Services ("CJIS") audit to determine which police officers had run CORI checks on Merrill and Cotty (we hereafter refer to this audit as the "CORI matter" or CORI investigation"). On November 22, 2016, Eaton sent his report on the CJIS audit to Jenkins. In response, Jenkins requested follow up, including a copy of the audit, the names of the involved officers and dates of the inquiries, and that each involved officer produce a report.

Later that same day, Eaton attended a BOS meeting expecting to receive a performance review and to discuss his $5,000 bonus. Smart explained that, based on Jenkins's advice, they could not discuss his contract or bonus because of "what [he] was working on with Attorney Jenkins." Eaton became frustrated, placed his hat and badge on the BOS's table, and said, "Here you go. Is this what you want?" before leaving the meeting. The next day, despite telling Smart that he would pick up his hat and badge, the Town issued a press release stating that Eaton had resigned and providing information related to the CORI investigation. The Town subsequently issued a press release clarifying that Eaton had not resigned and stating that "Town Counsel has been empowered to address all pending matters in the [TPD] and the Chief has been directed to immediately comply with all of Counsel's directives."

Following the November BOS meeting, Eaton continued his term as chief of police. On December 14, 2016, Eaton was instructed by Kreidler (at the direction of the BOS) to have the employees involved in the CORI matter appear for disciplinary hearings.[2] Before the hearings, Eaton objected to any disciplinary action being taken because he had not yet completed his investigation into the CORI issue. Jenkins then informed Eaton that he was conducting the CORI investigation, not Eaton.

Nevertheless, Eaton continued his investigation into the CORI matter by continuously communicating with officials from DCJIS and obtaining information from the involved officers. On January 30, 2017, Jenkins informed Eaton that he was directed by the BOS to investigate the CORI issue and that if Eaton had questions, that he should contact Kreidler -- which Eaton admits that he did not do, and on January 31, 2017, Jenkins emailed Eaton again, reiterating that the BOS had directed Jenkins to investigate the CORI matter, and directing Eaton to discontinue his separate investigation. Despite Jenkin's instructions, Eaton admits to continuing his investigation by speaking to DCJIS officials throughout late January and early February 2017. On February 8, 2017, Eaton received a report from DCJIS related to the CORI matter

---

[2] Sergeant Girard, one of the officers flagged during the CJIS audit, was placed on administrative leave during the hearing and ultimately resigned.

that stated that, with the exception of a query performed by a dispatcher on September 27, 2016, the identified transactions appeared to have been run for authorized law enforcement purposes. Eaton forwarded the report to Jenkins, who responded that "the investigation is ongoing," "until it is completed all the documents associated with this matter continue to be confidential," and that neither the "report nor the substance of the report should be released to anyone." Jenkins, once again, instructed Eaton to "not take any action in connection with the investigation."

### 5. BOS Memo and Press Release

At 2:40 p.m. on February 10, 2017, Eaton, believing that he "needed to take action to protect the TPD and the public trust in the TPD," sent the BOS a memorandum explaining why he conducted an independent investigation, and stating, in part, the following:

> It is clear that the investigation being conducted by the [Townsend BOS/TA] is a strategic assassination of the department, the police officers [sic] reputations and their character. The ordering of your investigation is a calculated and orchestrated maneuver to disparage and dismantle the entire department. . . . During your investigation, I have fully complied with all requests from David Jenkin[s] Esq. . . . I am requesting immediate action which is listed below from the [BOS] . . . . [Sergeant Randy Girard] shall be reinstated and made whole by giving him his rank, time in grade and compensated [sic] for all time lost. . . . It is further requested that a public statement be made by you and your office by today, Friday, February 10, 2017 at 5:00PM EST exonerating all 3 [Townsend] Police Officers and me as the

- 11 -

Chief of Police . . . . Failure to do so will result in a public statement by me as the Chief of Police in the form of a written press release.

At 5:02 p.m. that same day, Eaton published the press release, which closely mirrored the memorandum sent to the BOS, and included the statement that Eaton "h[ad] fully complied with all requests from the [Townsend] legal counsel." Eaton was immediately placed on paid administrative leave.

### 6. Eaton's Medical Treatment

While out on administrative leave, Eaton was admitted to McLean Hospital, where he received inpatient treatment for his post-traumatic stress disorder ("PTSD"), alcohol abuse, depression, and anxiety. Following his discharge on March 1, 2017, Eaton continued receiving outpatient treatment, and, on March 28, 2017, when he appeared to be interviewed by Jenkins in connection with the CORI matter, he presented doctors' notes, one of which stated that it was the doctor's "recommendation that [Eaton] not testify or answer questions at any hearing until he completes his current treatment."

### 7. Eaton's Disciplinary Notice

On April 6, 2017, the BOS met in an executive session to discuss Eaton's employment. During the meeting, Jenkins presented findings of fact pertaining to Eaton's conduct leading up to and during the CORI investigation. The BOS voted to accept Jenkins's

factual findings and to issue a disciplinary hearing notice to Eaton. Eaton received the disciplinary hearing notice by email on April 6, 2017, and by constable delivery on April 7, 2017. The notice, which scheduled his disciplinary hearing for April 21, 2017, detailed the complained of actions, provided a date range for when the actions occurred, and listed TPD rules that the actions, if proven, may have violated. In a letter to the BOS dated April 14, 2017, Eaton challenged the sufficiency of the notice because it "d[id] not include the dates and times of all alleged offenses" and requested a continuance based on a conflict with his attorney's trial schedule. Kreidler denied his request for a continuance because the request did not come from Eaton's attorney directly and because the basis of the conflict was inadequately explained. Eaton's attorney never followed up with a direct request for a continuance.

## 8. Eaton's Termination

On April 21, 2017, Eaton appeared for his disciplinary hearing with his attorney, who requested a continuance given Eaton's PTSD. In support of his request, Eaton's attorney produced three notes from Eaton's doctors stating that he was receiving treatment for PTSD -- including the note that recommended that Eaton not testify or answer questions at a hearing until his treatment was complete. The BOS voted unanimously to proceed with Eaton's termination hearing. Eaton contends that if the hearing

- 13 -

had been postponed, he would have been able to properly assist his attorney in preparing a response and that he would have been able to testify at the hearing.

Following the vote, Jenkins presented his proposed findings of fact and thirty-four supporting exhibits, which included copies of Jenkins's email exchanges with Eaton relative to the CORI matter, Eaton's memorandum to the BOS, and a printout from the TPD's Facebook page where Eaton's press release was posted. Jenkins informed the BOS that they were not bound by his findings of fact, that they were just guidance, and that the BOS should decide the facts based on the evidence. Eaton contends that during Jenkins's presentation, King was looking at her computer and Smart had her head on the desk and appeared uninterested.

Next, Eaton's attorney presented. He began by reiterating that Eaton's doctor had restricted his ability to defend himself at the hearing. Jenkins then offered Eaton the opportunity to make a verbal statement without being subject to cross-examination or to submit a written statement, like Eaton had prepared a few days prior in a former TPD employee's employment case. Eaton's attorney requested three weeks to prepare a written statement, and Eaton contends that Jenkins responded that he could have ten minutes. The BOS's meeting minutes only state that Jenkins responded "today" and that he recommended that the BOS not

continue the hearing. Eaton's attorney declined both of Jenkins's offers. The BOS's report of the hearing indicates that Eaton's attorney introduced sixteen exhibits, which included notes from Eaton's doctors, the DCJIS report, and the internal investigation report from Lieutenant Giancotti, among other evidence.

Following the conclusion of Eaton's attorney's presentation, the BOS voted unanimously, and without discussion, to adopt the findings of fact and exhibits as presented. The BOS then unanimously voted, again without discussion, that the findings of fact and exhibits constituted violations of Eaton's employment contract and TPD rules and regulations. Finally, the BOS voted unanimously, and again without discussion, that just cause existed to terminate Eaton's contract effective immediately based on the findings of fact, which established rule and contract violations.

On May 4, 2017, Eaton received a report of the hearing and notice of termination from the BOS. The notice recited the evidence presented at Eaton's termination hearing and the BOS's factual findings from the hearing, before specifying the rules and contract provisions that the BOS found Eaton had violated, along with the corresponding conduct. Among its findings, the BOS concluded that Eaton was insubordinate in having continued his personal investigation after being ordered to stop, that he was insubordinate to the BOS in issuing them an unprofessional

- 15 -

ultimatum demanding certain action, and that Eaton was untruthful when he stated in his press release that he had complied with all of Jenkins's requests.

## B. Procedural History

Eaton filed two separate actions in Massachusetts Superior Court following his termination: The first was against Townsend, Kreidler, and Clark, and the second was against King and Smart. The cases were removed to federal court and consolidated. The district court granted, in part, the Defendants' motion to dismiss, which left the following claims: breach of contract (Townsend); breach of the covenant of good faith and fair dealing (Townsend); disability discrimination under the Americans with Disabilities Act ("ADA") and chapter 151B, section 4 of the Massachusetts General Laws (Townsend); retaliation under the ADA and chapter 151B, section 4 of the Massachusetts General Laws (Townsend); procedural due process violation (Townsend, King, Smart, and Clark); and intentional interference with a contractual relationship (Kreidler and Clark). On March 30, 2022, the district court granted summary judgment in favor of the Defendants on the remaining claims, which were then dismissed with prejudice. This timely appeal followed.

## II. Standard of Review

"We review a district court's grant of summary judgment de novo" and will affirm "only if 'there is no genuine dispute as

- 16 -

to any material fact and the movant is entitled to judgment as a matter of law.'" Triangle Cayman Asset Co. v. LG & AC, Corp., 52 F.4th 24, 32 (1st Cir. 2022) (quoting Fed. R. Civ. P. 56(a)). A fact is material when it has "the 'potential to affect the outcome of the suit under the applicable law,'" and "[a] dispute is 'genuine' if 'the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). While we draw all reasonable inferences in favor of the nonmovant -- here, Eaton -- we need not "credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007).

### III. Discussion

#### A. Breach of Contract Claim Against Townsend

We begin with Eaton's breach of contract claim under Massachusetts law. To prevail, "a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 39 (Mass. 2016). "[J]ust cause [for termination] is an affirmative

- 17 -

defense" to a breach of contract claim, Goldhor v. Hampshire Coll., 521 N.E.2d 1381, 1385 (Mass. App. Ct. 1988), and thus the burden of proof rests with the defendant -- here, Townsend, see Chaplain v. Dugas, 80 N.E.2d 9, 11 (Mass. 1948). In evaluating just cause, courts consider "whether there existed . . . a reasonable basis for employer dissatisfaction with a new employee, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior." Joyal v. Hasbro, Inc., 380 F.3d 14, 21 (1st Cir. 2004) (quoting G & M Emp. Serv., Inc. v. Commonwealth, 265 N.E.2d 476, 480 (Mass. 1970)). "Discharge for a 'just cause' is to be contrasted with discharge on unreasonable grounds or arbitrarily, capriciously, or in bad faith." Id. (quoting G & M Emp. Serv., Inc., 265 N.E.2d at 480).

On appeal, Eaton claims that there are disputes of material fact as to whether Townsend possessed just cause for his termination. Specifically, he contends that a reasonable jury could conclude that (1) Townsend acted in bad faith in terminating him because most of the BOS's findings of fact are "patently false" and (2) that his memorandum to the BOS was reasonable, necessary, and did not contain false statements.

Eaton's arguments fail to persuade us. Although Eaton claims that the BOS's findings of fact are mostly false, and thus evidence the BOS's bad faith, he notably does not contest the facts

- 18 -

that the district court supportably relied on in finding that Townsend had just cause for his termination. It is undisputed that Eaton sent the BOS a memorandum, which he published publicly hours later, demanding that they take certain actions by 5:00 p.m. that same day and stating that he had complied with all of Jenkins's requests. The BOS found these facts to be true; determined that Eaton was insubordinate in issuing the BOS an unprofessional memorandum containing an ultimatum and untruthful in his statement in the press release that he complied with all of Jenkins's requests; and concluded that his actions amounted to violations of his employment contract and TPD policy -- thus justifying his termination.[3] Given the lack of a factual dispute over the BOS's good faith, reasonable basis for dissatisfaction with Eaton, Eaton is left to argue that a reasonable jury could conclude that his memorandum and press release did not amount to "inappropriate behavior" providing just cause for his termination. But his contentions lack support.

---

[3] Eaton argues that he could not be terminated for insubordinate or unprofessional behavior because the BOS did not make that finding during his termination hearing. However, Eaton's contract states only the following: "After any hearing, the [BOS] must make a written report of the evidence presented and its findings of fact. No evidence may be relied upon which was not produced at the hearing." Contrary to Eaton's assertion, his contract does not require that the BOS make its findings of fact during his termination hearing. Additionally, all of the evidence that the BOS relied on for its findings of fact (emails, Eaton's memorandum and press release) was produced at the hearing, and thus the BOS complied with the terms of Eaton's contract.

Eaton claims that his actions were not inappropriate because they were necessary to protect his reputation and the reputation of TPD given that the BOS had publicly defamed TPD and was engaged in a "strategic assassination of the department, the police officers' reputations, and their character." Such conclusory assertions, without more, are properly disregarded for purposes of summary judgment. See Cabán Hernández, 486 F.3d at 8. Even so, we fail to see how a reasonable jury could conclude that Eaton's termination was "arbitrary" or done in "bad faith" -- even viewing the evidence in the light most favorable to him -- given that Eaton does not challenge the BOS's conclusion that his issuance of the ultimatum containing memorandum violated TPD policy. See Joyal, 380 F.3d at 22 (concluding that no reasonable jury could find that an employee's discharge was "arbitrary" or unjustified where he sought to violate company policy).

Next, Eaton asserts that a reasonable jury could find that his statement -- that he complied with all of Jenkins's requests -- was not false because his response was limited to a November 2016 press release that claimed he had refused to turn over information to Jenkins. Despite his contention on appeal, Eaton's statement in the memorandum and press release was not so narrowly stated. As the district court correctly found, the undisputed evidence establishes that on February 10, 2017, Eaton had not complied with all of Jenkins requests given that he did

not cease his personal investigation into the CORI matter, did not keep the DCJIS report confidential, and continued to take further action with respect to the investigation.[4]  Based on the undisputed evidence, a reasonable jury could come to only one conclusion -- that Eaton's statement in the memorandum and press release on February 10, 2017, was false.

Having disposed of Eaton's arguments, we cannot say that the district court erred in finding that Townsend had met its burden of establishing just cause for Eaton's termination.  Thus, entry of summary judgment for Townsend was proper.

## B. Breach of Covenant of Good Faith and Fair Dealing Against Townsend

The covenant of good faith and fair dealing is implied in every Massachusetts contract.  See Ayash v. Dana Farber Cancer Inst., 822 N.E.2d 667, 683 (Mass. 2005).  The implied covenant "provides 'that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  Robert & Ardis James Found. v. Meyers, 48 N.E.3d 442, 450 (Mass. 2016) (citation omitted).

---

[4] Eaton vigorously argues that, as a "strong chief," the BOS and Jenkins had no authority to stop his investigation or prevent him from issuing a press release, and that Jenkins was never properly authorized by a BOS vote to conduct the CORI investigation.  Eaton's contentions, however, have no bearing on whether he made a false statement regarding his compliance with Jenkins's requests and whether he behaved unprofessionally in issuing the BOS an ultimatum.

Because "[t]he scope of the covenant is only as broad as the contract that governs the particular relationship," Ayash, 822 N.E.2d at 684, the covenant may not be "invoked to create rights and duties not otherwise provided for in the existing contractual relationship," Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004). "[T]he plaintiff has the burden of proving a lack of good faith," which may be "inferred from the totality of the circumstances." T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 924 N.E.2d 696, 704 (Mass. 2010) (explaining that there is "no requirement that bad faith be shown").

Here, Eaton appears to contend that Townsend breached his employment contract's implied covenant by terminating him in bad faith and that, because bad faith is a question of fact, summary judgment was improper. Under Massachusetts law, "a termination not made in good faith constitutes a breach of the contract." Fortune v. Nat'l Cash Reg. Co., 364 N.E.2d 1251, 1256 (Mass. 1977). However, as discussed supra, undisputed facts establish that Townsend had just cause for Eaton's termination (based on his memorandum to the BOS giving them an ultimatum and false statement in his press release), and just cause itself requires an employer to act in good faith in terminating the employee, see Joyal, 380 F.3d at 21 (citation omitted).

Further, no reasonable jury could find that the BOS lacked good faith in terminating Eaton based on his asserted "bad

- 22 -

faith" facts. Eaton contends that Clark and Kreidler sought to interfere with the day-to-day operations of the police department; that he never received his performance review; that the BOS never voted on whether to approve his bonus; that false and defamatory press releases were published about Eaton and the TPD; and that Jenkins sought to interfere with his lawful investigation into the CORI matter. Drawing all inferences in Eaton's favor, these facts establish, at most, that Townsend treated Eaton unfairly during his term of employment. However, as the district court correctly noted, unfair treatment is insufficient to establish a breach of the implied covenant of good faith and fair dealing claim. See Ayash, 822 N.E.2d at 684 (noting that an employer has no general duty to act "nicely" and that where a plaintiff's claim rests on allegations of unfair treatment, the plaintiff cannot recover).

To the extent that Eaton contends that Townsend's lack of good faith in terminating him is established by the BOS's wrongful refusal to continue Eaton's disciplinary hearing or by Clark and Smart voting to terminate him based on personal animus, his claim also fails. The undisputed evidence establishes that Eaton's attorney never directly requested a continuance based on a scheduling conflict and that Eaton's request for a continuance based on his PTSD was made the morning of the hearing, without adequate explanation for why Eaton could not participate meaningfully through his attorney or a written statement.

- 23 -

Additionally, Eaton's assertion that Clark and Smart voted to terminate Eaton based on personal animus is, without more, the type of "empty conclusion[]" disregarded at summary judgment. See Cabán Hernández, 486 F.3d at 8. Based on the foregoing, the district court did not err in entering summary judgment for Townsend on Eaton's implied covenant claim.

**C. Due Process Claim Against Townsend, King, Smart, and Clark**

"[P]ublic employees[,] who can be discharged only for cause[,] have a constitutionally protected property interest in their tenure and cannot be fired without due process." Gilbert v. Homar, 520 U.S. 924, 928-29 (1997). Here, it is undisputed that Eaton had a property interest in his employment. Thus, the only dispute is whether Townsend provided Eaton with due process before terminating him.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). "[P]ublic employees are ordinarily entitled to notice of the reasons for a proposed termination, an explanation of the evidence supporting those reasons, and an opportunity to give their side of the story at a pre-termination hearing." Jones v. City of Bos., 752 F.3d 38, 56-57 (1st Cir. 2014). To satisfy due process, said hearing "should provide 'a meaningful opportunity to invoke the discretion of the

decisionmaker,' both as to the facts supporting the termination and as to its broader appropriateness." Id. at 57 (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 543 (1985)).

Before us, Eaton does not contest that he received notice of the termination hearing, a preview of the evidence supporting the allegations against him, or an opportunity to be heard. He contends only that his termination hearing was a sham, depriving him of constitutionally adequate due process, because: (1) the members of the BOS, who oversaw his termination hearing, were impermissibly biased against him; (2) the BOS decided to terminate Eaton prior to his termination hearing; (3) the BOS failed to give Eaton ten full business days' notice of the termination hearing; (4) the BOS declined Eaton's requests for a continuance; and (5) the BOS posted an employment opening for the chief of police position prior to Eaton's termination hearing. However, none of Eaton's assertions provide a basis for overturning the district court's grant of summary judgment.

As to the BOS's alleged bias, Eaton asserts that "a biased decisionmaker [is] constitutionally unacceptable." But, Eaton's claim fails because contrary to Eaton's assertion, there is "not . . . a basic requirement that hearing officers be impartial in the employment context." Lawless v. Town of Freetown, 63 F.4th 61, 68 (1st Cir. 2023). In fact, an employer, who initiates an employee's termination, may preside over the

termination hearing.  See id.  That is not to say that bias can never be "so severe as to interfere with due process at the hearing itself."  See Chmielinski v. Massachusetts, 513 F.3d 309, 318 (1st Cir. 2008).  However, a plaintiff "must overcome a presumption of honesty and integrity in those serving as adjudicators" and demonstrate "a risk of actual bias or prejudgment," Withrow v. Larkin, 421 U.S. 35, 47 (1975), which precluded the employee from "put[ting] his version of the facts before the decisionmaker" or that resulted in termination on grounds "that could be explained only by bias," Chmielinski, 513 F.3d at 318.  As we discuss below, Eaton fails to overcome that presumption.

First, Eaton argues that all three members of the BOS were impermissibly biased because Eaton had publicly and privately criticized them.  However, Eaton raises this argument for the first time on appeal.  Because Eaton fails to point to any "extraordinary circumstances" that justify us departing from the "bedrock rule that when a party has not presented an argument to the district court, [he] may not unveil it in the court of appeals," United States v. Taylor, 511 F.3d 87, 91 (1st Cir. 2007) (alteration in original) (quoting United States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992)), we decline to entertain this claim.

Next, Eaton contends that Smart and Clark's alleged bias against him establishes that his termination hearing was a sham.  Regarding Smart, Eaton claims that she was biased because she

believed that members of TPD were supporting the recall movement, she lied to Eaton on various occasions, and because, as a percipient witness, she should have been disqualified from overseeing his termination hearing. However, Smart's alleged bias against Eaton is not borne out by the record. Smart never accused Eaton personally of supporting the recall movement and his claim that she lied to him -- "ma[de] an untrue statement with intent to deceive," see Lie, The Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/lie (last visited May 3, 2023) -- is speculative. Although Eaton -- citing Williams v. Pennsylvania, 579 U.S. 1, 8-9 (2016) (addressing judicial bias) -- contends that Smart could not oversee his termination hearing as both an "accuser and adjudicator," he overlooks our precedent, which establishes that a "termination hearing is not a court of law, and [that] the same level of process is not required," Chmielinski, 513 F.2d at 316. He also fails to explain how the facts of his case are different from the other employment termination cases where we have held that a terminating employer -- who bears witness to an employee's improper conduct or deficient performance and initiates termination proceedings -- may preside over the termination hearing. See, e.g., Lawless, 63 F.4th at 68; Chmielinski, 513 F.3d at 318; Acosta-Sepúlveda v. Hernández-Purcell, 889 F.2d 9, 12 (1st Cir. 1989).

- 27 -

As to Eaton's claim that Clark was impermissibly biased, Eaton points to the fact that his relationship with Clark was acrimonious. Clark continuously pressured Eaton to demote, transfer, or not promote certain TPD employees, which he refused to do; Eaton pointed out that Clark's involvement in TPD matters created a conflict of interest because of Clark's wife's discrimination complaint; Clark believed that Eaton or other members of the TPD were erroneously blaming his wife for investigations into the department; and Clark's wife's attorney sent Eaton a cease-and-desist letter. Even crediting Eaton's asserted facts and the reasonable inferences drawn therefrom, Eaton fails to demonstrate that any alleged bias by Clark precluded him from presenting "his side of things to correct errors of fact on which the termination decision [wa]s based." See Chmielinski, 513 F.3d at 318. Eaton's contract provided for his removal by "a majority of the members of the [BOS] after a hearing." Thus, even if we were to assume arguendo that Clark was biased against him, Eaton cannot establish that his termination hearing was a sham based on Clark's alleged bias where an unbiased majority of the BOS still voted to remove him.

Eaton further argues that his termination hearing was a sham because the BOS made their decision to terminate Eaton prior to his termination hearing. As support, he cites the BOS's decision to accept Jenkins's proposed findings of fact related to

Eaton's alleged misconduct on April 7, 2017 -- prior to his termination -- and the BOS's acceptance of the same findings of fact, without discussion, at his termination hearing on April 21, 2017. Eaton also points to Smart and King's alleged inattention during his termination hearing as evidence that the decision was predetermined.

However, Eaton's claims fail to find purchase. Our case law makes clear that even where a termination decision is made by the decisionmaker prior to a hearing, no "constitutional infirmity" results where the planned termination is subject to reconsideration if the employee "contest[s] the validity of the grounds for termination." See O'Neill v. Baker, 210 F.3d 41, 49 (1st Cir. 2000); see also West v. Hoover, 681 F. App'x 13, 17 (1st Cir. 2017) (unpublished decision). Here, Eaton fails to "point to any evidence in the record suggesting that the relevant decision-maker -- [the BOS members] -- had decided in advance of the pre-termination hearing that nothing [they] heard there would have changed [their] mind[s]." See West, 681 F. App'x at 17. Each member of the BOS testified that they did not make a decision about Eaton's employment until his termination hearing, and the mere fact that King was on social media and that Smart had her head on the desk does not establish that either was unwilling to consider evidence presented by Eaton. Eaton also argues that it is error to rely on O'Neill or West because both cases involved post-

termination proceedings. However, Eaton's argument does not persuade us because our conclusion in both cases -- that no due process violation arises if a planned termination is subject to revision -- in no way rested upon the existence of plaintiff's entitlement to a post-termination hearing. See id.; O'Neill, 210 F.3d at 49.

Eaton further contends that the BOS's failure to give him a full ten business days' notice of his termination hearing, per his contract, demonstrates that it was a sham. Eaton admits to receiving the notice on April 6, 2017, and drawing all inferences in his favor, including his assertion that Patriot's Day should not have counted as a business day, Eaton still received nine business days' notice of his termination hearing and fourteen days' regular notice. Eaton's notice contention, which he failed to raise before the BOS, is easily dismissed given that due process only requires notice that provides "a reasonable time for those interested to make their appearance." See Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950); Cepero-Rivera v. Fagundo, 414 F.3d 124, 134-35 (1st Cir. 2005) (concluding that the plaintiff received adequate notice when he received a letter from his employer fifteen days before his termination hearing). No reasonable jury could conclude that Eaton's termination hearing was a sham on this basis.

Nor does the BOS's refusal to continue Eaton's termination hearing demonstrate that the same was a sham. Despite his contentions, the undisputed evidence establishes that Eaton, and not his attorney, requested a continuance based on his attorney's trial schedule. After the continuance was denied because Eaton's attorney had not communicated the request directly or adequately explained the scheduling conflict, Eaton's attorney never reiterated the request for a continuance.

Eaton next alleges that the BOS's refusal to continue his termination hearing based on his then-ongoing PTSD treatment establishes that the hearing was a sham. Per Eaton, the BOS knew that he was undergoing treatment and "did not care that Eaton would not be able to articulate his side of the story." His assertions fall short for a number of reasons. Namely, Eaton never requested a continuance based on his then-ongoing PTSD treatment until the day of his termination hearing; the medical documentation Eaton provided only recommended that "he not testify or answer questions at any hearing" and it is undisputed that he was offered the opportunity to submit an affidavit, which he had done days earlier in support of another officer; and Eaton was represented by counsel, who had an opportunity to present evidence on Eaton's behalf (and did so), and nothing in the medical documentation indicated that Eaton's condition prevented him from communicating with his attorney. See Calderón-Garnier v. Rodríguez, 578 F.3d

- 31 -

33, 38-39 (1st Cir. 2009) (finding no due process violation where plaintiff could not attend pre-termination hearing because "[t]here is nothing in the record to suggest plaintiff was so incapacitated that he could not communicate with his lawyer to make arguments on his behalf" and because "due process does not impose a strict requirement that plaintiff must be present at a pre-termination hearing"); see also Cepero-Rivera, 414 F.3d at 135 (concluding that plaintiff received the process due to him when he was given an opportunity to attend his pre-termination hearing but "chose to present his arguments in writing"). Given that "the Constitution requires only an initial check against erroneous decisions, not that the [employer] follow best practices," O'Neill, 210 F.3d at 49 n.10, the BOS denying Eaton's request for a continuance does not create a triable issue of fact that his hearing was a sham.

Finally, Eaton asserts that the BOS posting the chief of police position prior to his termination hearing and signing a contract with a new chief four days after his termination hearing demonstrates that it was a sham. However, Eaton does not point to any evidence establishing if and when the position was posted and nothing about the BOS signing a contract for an interim chief after Eaton's termination demonstrates that the BOS's decision four days earlier, even assuming it was predetermined, was not subject to revision. See id. at 49 (concluding that actions taken by an

- 32 -

employer in preparation for an employee's planned termination did not violate due process where the termination decision remained subject to revision).

Because a reasonable jury could not conclude that Eaton's termination hearing was a sham based on his asserted facts, summary judgment for the Defendants was proper.

## D. Disability Discrimination Claim Against Townsend

Eaton next claims that Townsend failed to continue his termination hearing as an accommodation to his disability. To withstand summary judgment on a failure-to-accommodate claim, "a plaintiff must point to sufficient evidence showing that (a) []he is disabled within the ADA's definition; that (b) []he could perform the job's essential functions either with or without a reasonable accommodation; and that (c) the employer knew of h[is] disability, yet failed to reasonably accommodate it." Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 454 (1st Cir. 2016). The second prong requires a plaintiff to show "that []he possesses the requisite skill, experience, education and other job-related requirements for the position" and "that []he is able to perform the essential functions of the position with or without reasonable accommodation." Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 126 (1st Cir. 2017) (quoting Mulloy v. Acushnet Co., 460 F.3d 141, 147 (1st Cir. 2006)). "The plaintiff bears the burden of showing the existence of a reasonable accommodation." Id. at 127.

On appeal, Eaton contends that a reasonable jury could find that Townsend violated the ADA and chapter 151B, section 4 of the Massachusetts General Laws when the BOS denied his request to continue his termination hearing for six weeks as a reasonable accommodation to his disability -- his PTSD. However, he fails to offer any evidence demonstrating that the accommodation he sought would have enabled him to perform the essential functions of the chief of police position. Instead, Eaton focuses exclusively on the fact that, had the continuance been granted, he "would have been able to properly assist his attorney in preparing his response" and "able to testify at the hearing, publicly demonstrating that he should not be terminated, thereby repairing his reputation." Eaton merely repackages a due process argument as a disability claim. Thus, we need not reach Eaton's claim that his request for an accommodation was timely and reasonable where he fails to develop any argument that said accommodation was in some way connected to the essential functions of his job. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[W]e see no reason to abandon the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Summary judgment for Townsend on Eaton's disability claim was proper.

**E. Tortious Interference Claim Against Kreidler and Clark**

To survive summary judgment on a tortious interference with contractual relations claim under Massachusetts law, a plaintiff must offer sufficient evidence that: "(1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract . . . ; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Pierce v. Cotuit Fire Dist., 741 F.3d 295, 304 (1st Cir. 2014) (omission in original) (quoting O'Donnell v. Boggs, 611 F.3d 50, 54 (1st Cir. 2010)); see also Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 536 (Mass. 2011) (citation omitted) (same). A plaintiff cannot bring an interference claim against his own employer but may raise such a complaint against an "individual official of the employer" if he can establish that the "individual official" induced the employer to breach plaintiff's employment contract with actual malice. See Pierce, 741 F.3d at 304; Psy-Ed Corp., 947 N.E.2d at 537; Blackstone v. Cashman, 860 N.E.2d 7, 17 (Mass. 2007).

"Proof of actual malice requires more than a showing of mere hostility." Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 76 (1st Cir. 2001); see King v. Driscoll, 638 N.E.2d 488, 495 (Mass. 1994) (explaining that "personal dislike will not warrant an inference of the requisite ill will"). A plaintiff must prove

that malice, or "a spiteful, malignant purpose," see Psy-Ed Corp., 947 N.E.2d at 538 (citation omitted), "was the controlling factor in the [official]'s interference." See Zimmerman, 262 F.3d at 76; Alba v. Sampson, 690 N.E.2d 1240, 1243 (Mass. App. Ct. 1998). A showing of malice must be "probab[le] rather than possib[le]' and the evidence must suggest that "the [official]'s actions 'were not derived from a desire to advance the employer's legitimate business interests.'" Pierce, 741 F.3d at 304-05 (alteration in original) (quoting Zimmerman, 262 F.3d at 76-77); see also Gram v. Liberty Mut. Ins. Co., 429 N.E.2d 21, 24-25 (Mass. 1981); Psy-Ed Corp., 947 N.E.2d at 536.

Here, Eaton contends that a reasonable jury could find that Kreidler and Clark acted with actual malice in interfering with his employment contract. As to Clark, Eaton contends that actual malice could be inferred from Clark's attempted interference with the TPD and from Clark and Eaton's repeated confrontations over the same. He alleges that a reasonable jury could conclude that Clark voted to terminate Eaton's employment in retaliation for his refusal to exact revenge against Clark's wife's "alleged tormentors" and because Eaton privately and publicly criticized Clark. Nevertheless, the BOS, which Clark was a member of, had a legitimate interest in terminating Eaton based on the undisputed evidence that he issued the BOS a memorandum, containing an ultimatum and a false statement, and then published the same as

a press release. Where there is evidence of "malicious motives and a motive related to the corporation's legitimate interests, the plaintiff has the burden of proving that [defendant]'s 'actions were unrelated to any legitimate corporate interest.'" Clement v. Rev-Lyn Contracting Co., 663 N.E.2d 1235, 1237 (Mass. App. Ct. 1996) (quoting Boothby v. Texon, Inc., 608 N.E.2d 1028, 1040 (Mass. 1993)). Eaton has failed to meet that burden here, and, thus, summary judgment for Clark was proper.

As to Kreidler, Eaton points to numerous facts that he claims establish Kreidler's malice towards him. Keeping in mind that we need not "credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective," Cabán Hernández, 486 F.3d at 8, we recite the remaining facts offered by Eaton accordingly: Kreidler repeatedly pressured Eaton to make personnel changes within the TPD; told Eaton that the BOS was not happy with his performance; told Jenkins that the BOS had authorized an investigation into the TPD despite knowing that no vote had been taken; failed to deliver information and documents to the BOS; and encouraged the BOS to terminate Eaton's employment. He further asserts that a reasonable jury could conclude that Kreidler interfered with Eaton's contract to retaliate against Eaton for refusing to follow his requests; refusing to issue a press release addressing claims made against Kreidler by Townsend residents; for complaining about Kreidler to the BOS; and for raising concerns

about Kreidler's hiring decisions. Despite his numerous assertions, Eaton cannot establish that "spite or malevolence," as opposed to a legitimate employment interest, "was the controlling factor in [Kreidler] urging [Eaton]'s discharge" given the undisputed nature of his removal-worthy conduct. See Alba, 690 N.E.2d at 1243. Nor can Eaton establish that Kreidler, motivated by animus, orchestrated the investigation into the use of CJIS by the TPD -- which ultimately resulted in Eaton's termination -- where the undisputed evidence is that Eaton's own handling of CORI information and response when questioned prompted the investigation by Jenkins. Finally, Eaton contends that a reasonable jury could find that Kreidler tortiously interfered with Eaton's employment by erroneously instructing the BOS not to consider his performance bonus and by issuing defamatory press releases. However, he failed to adequately develop these arguments in his opening brief, see Zannino, 895 F.2d at 17 ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . ."), and may not "use a reply brief to cure that deficiency," United States v. Laureano-Salgado, 933 F.3d 20, 27 n.11 (1st Cir. 2019). Thus, the district court was warranted in entering summary judgment for Kreidler on Eaton's tortious interference claim.

## IV. Conclusion

For the foregoing reasons, we **<u>affirm</u>** the district court's entry of summary judgment in favor of Defendants on all claims.